**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| MARK ARENDT, on behalf of himself and all others similarly situated,<br><br>   Plaintiff,<br><br>   v.<br><br>FORD MOTOR COMPANY,<br><br>   Defendant. | Case No: 19-cv-01886<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Mark Arendt, individually and as the representative of a class of similarly situated persons, by and through his undersigned counsel, alleges as follows:

**INTRODUCTION**

1.      This class action arises from Ford Motor Company's ("Ford" or "Defendant") design, manufacturing, marketing, and sale of 2017-2019 Ford automobiles including 2017-2019 Ford F-150 trucks and 2019 Ford Rangers, with deceptive fuel economy ratings and emissions ("Class Vehicles").

2.      Ford represented to Plaintiff and the Class that Class Vehicles had achieved specific miles-per-gallon ("MPG") estimates through its marketing, including window stickers. Ford, however, concealed that it conducted inadequate and inaccurate EPA fuel economy testing that resulted in inflated MPG estimates.

3.      Ford misrepresented the "road load"—the sum of forces acting on a vehicle—used in fuel economy calculations by manipulating testing parameters thereby producing unrealistic and overstated fuel economy ratings that would not reflect real-

world performance. Even Ford's own employees questioned its flawed testing methods in September of 2018.

4.    Ford knew or should have known facts indicating the inaccuracies in its promised MPG of the Class Vehicles. Ford recklessly or consciously disregarded facts that indicated the fuel economy ratings for the Class Vehicles were erroneous and overstated. Ford's warranties, advertising, and other statements about the promised MPG of the Class Vehicles are false and misleading. Ford has not corrected its misstatements and omissions or disclosed to consumers the true fuel economy ratings of the Class Vehicles.

5.    Ford's misrepresentations, concealment, and non-disclosure of true fuel economy numbers misled Plaintiff and Class members into purchasing vehicles of a quality different from what was promised, paying more for Class Vehicles than they otherwise would have, and paying higher fuel costs that they otherwise would not have paid. Through this lawsuit, Plaintiff, on behalf of himself and all other owners and lessees of Class Vehicles, seek to remedy the harm and damages suffered as a result of Ford's misconduct.

## JURISDICTION AND VENUE

6.    The Court has jurisdiction pursuant to 28 U.S.C. §§ 1332(a) and (d) because the amount in controversy exceeds $5,000,000, exclusive of interest and costs; there are more than 100 class members; and Plaintiff, as well as one or more class members are citizens of a state different from Defendant.

7.      In addition, under 28 U.S.C. § 1367, this Court may exercise supplemental jurisdiction over the state law claims because all of the claims are derived from a common nucleus of operative facts and are such that Plaintiff ordinarily would expect to try them in one judicial proceeding.

8.      This Court has personal jurisdiction over Ford because they conduct substantial and continuous business in the State of Minnesota.

9.      Venue is proper in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims occurred in the State of Minnesota and the Defendant conducts a substantial part of its business within this District. Ford also sells a substantial number of automobiles in this district, has dealerships throughout this district, and the misconduct occurred, in part, in this district.

## PARTIES

10.      Plaintiff Mark Arendt is a Minnesota citizen and resides in Bloomington, Minnesota. In November 2018, Mr. Arendt purchased a new 2018 F-150 Ford SuperCrew truck from Apple Ford, an authorized Ford dealership, located in Shakopee, Minnesota for approximately $46,290.

11.      Prior to purchasing this vehicle, Mr. Arendt viewed advertisements for the vehicle, the vehicle's window sticker (which advertised 23 MPG for highway driving, 17 MPG city driving, and a combined MPG of 19), and spoke with Ford sales representatives concerning the vehicle's features, including fuel mileage.  He also compared the fuel efficiency of other similar trucks and selected the F-150, in part, based on Ford's representations about the truck's fuel efficiency.

12.     Since his purchase, Mr. Arendt has not seen his vehicle reach the advertised combined MPG during his driving. Unbeknownst to Plaintiff at the time the vehicle was purchased, his F-150 consumes more fuel than advertised. Neither Ford, its agents, dealers, nor other representatives informed Plaintiff of the true fuel economy rating of the vehicle at any time before or after his purchase.

13.     Plaintiff relied on Defendant's misrepresentations and omissions when deciding to purchase the vehicle. If Plaintiff had known about the actual fuel economy ratings, Plaintiff would not have purchased his vehicle or would not have paid as much as he did for it. As a result, Plaintiff has suffered an ascertainable loss as a result of Ford's misconduct.

14.     Ford Motor Company is a Delaware corporation with its principal place of business in Dearborn, Michigan. At all relevant times, Ford engaged in the business of designing, manufacturing, marketing, warranting, distributing, selling, and leasing automobiles, including Class Vehicles, throughout the United States.

15.     Ford also developed and disseminated the owner's manuals, supplements, warranty booklets, advertisements, and other promotional and marketing materials related to the Class Vehicles. Ford created, designed, and disseminated information about the quality of Class Vehicles to various publications for the express purpose of having that information reach potential consumers. Ford further provided these materials to authorized dealerships for the express purpose of having these dealerships pass such materials to potential purchasers at the point of sale.

## FACTUAL ALLEGATIONS

### i.  *EPA Regulation of Fuel Economy Reporting and Emissions*

16.    Automobiles are major sources of air pollution, which includes ozone, particulate matter, and other smog-forming emissions. Cars and trucks contribute to pollution by producing significant amounts of nitrogen oxides, carbon monoxide, and other pollution. The health risks of air pollution are extremely significant—poor air quality increases respiratory ailments like asthma and bronchitis, heightens the risk of life-threatening conditions like cancer, and burdens the American health care system with substantial medical costs.  The U.S. government, through the Environmental Protection Agency ("EPA"), has passed and enforced laws designed to protect its citizens from these pollutants and certain chemicals and agents known to cause disease in humans.

17.    In order to sell vehicles in the U.S., automakers are required by law to use the EPA's standardized testing methods to receive official ratings and federal certification.

18.    Ford is required by law to obtain an EPA-administered certificate of conformity ("COC") certifying that the vehicle comports with the emissions standards for pollutants enumerated in 40 C.F.R. §§ 86.1811-04, 86.1811-09, and 86.1811-10. The Clean Air Act expressly prohibits automakers, like Ford, from introducing a new vehicle into the stream of commerce without a valid COC from the EPA. Moreover, vehicles must be accurately described in the COC application "in all material respects" to be deemed covered by a valid COC.

19.    EPA ratings are the vehicle's miles-per-gallon ("MPG") estimates that are publicly posted on the vehicle (generally a window sticker). These ratings are often relied upon by consumers when deciding which vehicles are more fuel efficient, and factor heavily into their purchasing decision. This is especially true of pickup trucks like the Class Vehicles at issue here.

20.    Manufacturers are only required to test one representative vehicle for each combination of loaded vehicle weight class, transmission class, and basic engine. Ford deliberately misconstrued and misrepresented factors used in this certification testing so as to report that Class Vehicles used less fuel and emitted less pollution than they actually did.

21.    Under EPA regulations, automobile manufacturers are required to submit "road load" results as part of this testing. Ford itself states that "[ro]ad load is a vehicle-specific resistance level used in vehicle dynamometer testing, including for fuel economy ratings and emissions certifications. . . . [,] established through engineering models that are validated through vehicle testing, including physical track tests referred to as coastdown testing."[1]

22.    The standards and procedures for conducting coastdown testing are established by the Society of Automotive Engineers ("SAE"). Data variability and error can be controlled, but several factors must be considered: calculation of the vehicles'

---

[1] Kim Pittel, *Ford Investigating Process for U.S. Emissions Certification Concerning Road Load*, FORD MEDIA CENTER – NEWS (Feb. 21, 2019), https://media.ford.com/content/fordmedia/fna/us/en/news/2019/02/21/ford-investigating-process-for-us-emissions-certification-conc.html.

mass, tire pressure, weather and environmental factors (*e.g.*, wind speed, air temperature, humidity, and barometric pressure), aerodynamic factors, road surface, experience design and methodology, measurement errors and data acquisition systems, and vehicle qualifications. The EPA has adopted SAE standards and procedures in its guidance to vehicle manufacturers regarding how to conduct coastdown tests and measure road load.

23.     During a coastdown test, forces such as "tire rolling resistance, driveline losses, and aerodynamic drag"[2] are considered and this data is used to program lab dynamometers to simulate real life conditions and generate fuel economy and emissions ratings. The vehicle is brought to a high speed on a flat, straight road and then allowed to decelerate with the transmission in neutral while its speed is periodically measured. The recording of time it takes for the vehicle to slow down allows for the modeling of these forces that affect the vehicle. This testing produces data that identifies the drag and other forces acting on the vehicle in the real world.

24.     While the simulation is subject to some manufacturer discretion, the EPA has made clear that the manufacturer should make these determinations using "good engineering judgment,"[3] and that "the manufacturer is responsible for the accuracy of the road-load force specification and dynamometer settings," and to insure [sic] that the

---

[2] EPA's Feb. 23, 2015 Letter to Manufacturers re: Determination and Use of Vehicle Road-Load Force and Dynameter Setting, available at https://iaspub.epa.gov/otaqpub/display_file.jsp?docid=34102&flag=1.
[3] *Id.* at 6.

vehicles it produces conform to the road-load specification reported in the application for certification and used for certification and fuel economy testing."[4]

### ii. Ford's Deceptive Road Load Testing

25.    The measure of these real-world forces against the vehicle is essential to the simulation of actual driving when a vehicle is tested in a lab. As stated by the EPA, it is imperative that the road-load force data specified by the manufacturer is representative of the of the final production fleet.[5] However, Ford's internal lab tests did not account for such forces, which resulted in better and incorrect fuel economy projections and less pollution than actually remitted.

26.    Upon information and belief, fuel economy target goals are set by Ford's management; determined through consideration of factors such as competitor vehicles and market research. As such, Ford's engineers are under enormous pressure to design vehicles to meet these targets.

27.    Upon information and belief, Ford's design process, proceeds with fuel economy goal as a key performance metric. During each three to five year development cycle, there is an interim period where the design team's management selects a representative configuration to use in determining a vehicle's fuel economy which is then tested via simulation. If a configuration fails to meet a target at any stage of the design process for a certain vehicle, engineers change the vehicle configuration simulation in

---

[4] *Id.* at 2.
[5] *Id.* at 7-9.

order to meet fuel economy goals, or otherwise must demonstrate to management why these goals cannot be met.

28.     During the beginning of a development cycle, road-load force specifications are estimated due to the lack of an available vehicle. A design team either selects a road-load co-efficient from a similar vehicle or use models to derive an estimate in advance of available vehicles for on-road testing. Ford lacks a standardized process to select road-load coefficients during the development cycle and leaves it up to the design team to select the coefficients. Once the vehicle has cleared simulation and vehicles are available, the vehicle moves to road load verification and certification testing.

29.     The pressure to meet top-down fuel economy targets can lead engineers or others to depart from testing standards incrementally until regulatory standards are met, rendering the test results inaccurate.

30.     Upon information and belief, Ford engineers departed from the EPA's standard for fuel economy testing by running road load tests under conditions and using parameters that did not conform with the written test specifications. This deception included adjusting vehicle equipment that affects aerodynamic drag, friction, and tire-related losses. Examples include adjusting or removing vehicle mirrors, recalibrating brakes, and using different tire pressures than those required by the test specifications.

31.     The above-described manipulation of road load tests resulted in lower road load specifications. When representative Class Vehicles were tested on the dynamometer, the lower road load specifications were used, resulting in higher fuel economy.

32.    By materially misrepresenting the road load specifications, Ford was able to produce unrealistic results in fuel economy and emissions testing that do not reflect the reality of real-world performance. Thus, the tested models for Class Vehicles reported higher than actual fuel efficiency than that of the actual Class Vehicles that Ford entered into the stream of commerce.

### ii. Ford Knew but Continued to Advertise Suspect Fuel Economy Ratings

33.    Ford knew and had reason to know of its suspect and misleading fuel economy ratings at least back to 2017 but chose to conceal it from the public. To protect its own financial interests, Ford actively coordinated to delay the reporting of Class Vehicles' actual fuel economy to regulators.

34.    In fact, Ford has a long history of promulgating false fuel economy data: in 2014, Ford had to downgrade the fuel economy ratings for six of its vehicles, by 1 to 7 MPG, making payments to the roughly 200,000 car owners affected. *See In re Ford Fusion & C-Max Fuel Econ. Litig.*, No. 13-MD-2450 (S.D.N.Y.). At that time, Ford's chief executive stated that Ford was "taking steps to improve [its] processes and prevent issues like this from happening again."[6]

35.    In September 2018, Ford's own employees reported possible flaws with its calculations based on computer models and physical testing procedures for certification

---

[6] Danielle Ivory, *Ford Lowers Gas Mileage on 6 Models, All 2013s-14s*, THE NEW YORK TIMES (June 12, 2014), https://www.nytimes.com/2014/06/13/business/ford-lowers-fuel-economy-ratings-on-some-of-its-cars.html.

of fuel economy and emissions.[7] Ford's recent disclosure of its concerns demonstrates an intentional or otherwise reckless disregard for ensuring that its testing methodology is proper.

36.    Ford failed to take any action to alert consumers or otherwise correct its continuing misrepresentations. Ford, undoubtedly aware of consumers' preference for more fuel-efficient vehicles in the truck market, continued to tout the fuel efficiency of Class Vehicles in its advertising.

37.    For instance, various media reports have recognized Ford's representations about the F-150 pickup truck as achieving the "best-in-class gas mileage honors for fuel economy from a gas engine," observing that such fuel economy is "always elusive in the full-size truck genre."[8]

38.    Even independent third party analyses have confirmed that the 2018 F-150 has not been able to meet or exceed Ford's fuel economy ratings despite significant efforts to do so. Edmunds described its findings: "The F-150 has settled in and gives us a great picture of the kind of real-world fuel economy an owner could expect, and it's

---

[7] Natasha Singer, *Ford Is Investigating Emissions and Fuel Efficiency Data*, THE NEW YORK TIMES (Feb. 21, 2019), https://www.nytimes.com/2019/02/21/business/ford-emissions.html.
[8] Christopher Smith, *Ford F-150 Claims Best-In-Class Gas Mileage, Towing Capacity*, MOTOR1.COM (Aug. 9, 2017), https://www.motor1.com/news/176394/ford-f150-fuel-mileage-towing-capacity/; *see also e.g.*, Max Goldberg, *Ford Announces Gas Mileage Ratings for 2018 Ford F-150*, THE DRIVE (Aug. 9, 2017), https://www.thedrive.com/news/13364/ford-announces-gas-mileage-ratings-for-2018-ford-f-150.

nowhere near the EPA estimates"—achieving only an average lifetime MPG of 17.4 when the EPA MPG rating is 21 combined (19 city/24 highway).[9]

39.    With its new 2019 Ranger pickup truck, Ford claims that it is the "most fuel-efficient gas-powered mid-size pickup in America—providing a superior EPA-estimated city fuel economy rating and an unsurpassed EPA-estimated combined fuel economy rating versus the competition."[10] Ford markets the two-wheel drive Ranger as getting 21 MPG city, 26 MPG highway, and 23 MPG combined; and the four-wheel drive Ranger as getting 20 MPG city, 24 MPG highway, and 22 MPG combined.

40.    Ford's false claims of the Class Vehicles being the most fuel efficient in its class is repeated in its marketing materials, including sales brochures.

41.    In Ford's annual SEC report filed February 21, 2019, Ford indicated that the company had become aware of a potential concern involving its U.S. emissions certification process, and that the company cannot assure that it will not have a material adverse effect on the company.

42.    In Ford's March 2019 SEC filing, Ford revealed that it is under criminal investigation by the U.S. Department of Justice for its emissions certification practices,

---

[9] Travis Langness, *2018 Ford F-150 Long-Term Road Test: Monthly Update for April 2019*, EDMUNDS (May 7, 2019), https://www.edmunds.com/ford/f-150/2018/long-term-road-test/2018-ford-f-150-monthly-update-for-april-2019.html.

[10] *Adventure Further: All-New Ford Ranger Rated Most Fuel-Efficient Gas-Powered Midsize Pickup in America*, FORD MEDIA CENTER – NEWS (Dec. 11, 2018), http://www.campaign.ford.com/content/fordmedia/fna/us/en/news/2018/12/11/ford-ranger-rated-most-fuel-efficient-gas-powered-midsize-pickup.html.

specifically focusing on its road load estimations, including analytical modeling and coastdown testing.[11]

## CLASS ACTION ALLEGATIONS

43.    Plaintiff brings all claims herein pursuant to Fed. R. Civ. P. 23. The requirements of Fed. R. Civ. P. 23 are all satisfied with respect to the classes defined below.

44.    Plaintiff seeks to represent the following Classes as well as any subclasses or issue classes as Plaintiff may propose and/or the Court may designate at the time of class certification:

### Nationwide Class

All individuals or entities who purchased or leased a Class Vehicle in the United States.

### Minnesota Subclass

All individuals or entities who purchased or leased a Class Vehicle in the State of Minnesota.

45.    Excluded from the proposed Class and Subclass is Defendant, its current employees, co-conspirators, officers, directors, legal representatives, heirs, successors and wholly or partly owned subsidiaries or affiliated companies; the undersigned counsel for Plaintiff and their employees; and the judge and court staff to whom this case is assigned.

---

[11] Ford's March 31, 2019 Quarterly Report to the SEC, p. 70, available at https://www.sec.gov/Archives/edgar/data/37996/000003799619000026/f0331201910-q.htm.

46.     Plaintiff reserves the right to amend class definitions if discovery or further investigation reveals that the classes should be expanded or otherwise modified.

47.     **Numerosity**:  Pursuant to Fed. R. Civ. P 23(a)(1), the Class is so numerous and geographically dispersed that joinder of all members is impracticable.  Although the exact number of Class members is uncertain and can be ascertained through appropriate discovery, Plaintiff is informed and believes that there are at least tens of thousands of members. The disposition of the claims of the class in a single action will provide substantial benefits to all parties and to the Court. Further, the Class members are readily identifiable from vehicle registration records, sales records, production records, and other information kept by Defendant and third parties in the usual course of business.

48.     **Commonality and Predominance**: Pursuant to Fed. R. Civ. P. 23(a)(2) and 23(b)(3), there are numerous questions of law and fact common to Plaintiff and the Class members, and those common questions predominate over any question affecting only individual Class members. The common legal and factual issues that predominate over individual questions include, without limitation, the following:

a.  whether Ford engaged in the conduct alleged herein;

b.  whether Ford designed, advertised, marketed, distributed, leased, sold, or otherwise placed Class Vehicles into the stream of commerce in the U.S.;

c.  whether Ford provided false information to consumers regarding Class Vehicles' fuel efficiency and emissions;

d.  whether Ford provided false information to the EPA regarding Class Vehicles' fuel efficiency and emissions;

e.  whether Ford had actual or imputed knowledge that the testing certifying Class Vehicles' fuel efficiency and emissions was tainted by inaccurate information and when Ford first learned of it;

f.  whether Ford intentionally designed, manufactured, marketed, and distributed Class Vehicles with misleading fuel efficiency and emissions ratings;

g.  whether Ford omitted and failed to disclose material facts, including the misleading fuel efficiency and emissions ratings of the Class Vehicles;

h.  whether the misleading fuel economy ratings of the Class Vehicles constitute a material fact to a reasonable person purchasing a Class Vehicle;

i.  whether Ford's unlawful conduct harmed Plaintiff and Class members;

j.  whether Ford has been unjustly enriched by its deceptive conduct;

k.  whether Plaintiff and Class members overpaid for their Class Vehicles as a result of Ford's misconduct as alleged herein;

l.  whether Plaintiff and the other Class members are entitled to damages and other monetary relief and, if so, in what amount; and

m.  whether Plaintiff and Class members are entitled to equitable or other injunctive relief.

49.  **Typicality:** Pursuant to Fed. R. Civ. P. 23(a)(3), Plaintiff's claims are typical of the claims of the Class members. Plaintiff, like all Class members, purchased a Class Vehicle and his claim arises from the same course of conduct by Defendant. Plaintiff's request for relief is typical of the relief sought for the absent Class members.

50.  Plaintiff and Class members received similar misrepresentations, warranties and non-disclosures about fuel economy and emissions as alleged herein. Defendant's misrepresentations were made pursuant to an unlawful, unfair, systematic, pervasive, pattern of misconduct engaged in by Defendant. Plaintiff and Class members purchased

or leased Class Vehicles that they would not have purchased or leased at all, or for as much as they paid, had they known the truth about Class Vehicles. Plaintiff and Class members suffered damages as a proximate result of Defendant's wrongful conduct.

51. **Adequacy**: Pursuant to Fed. R. Civ. P. 23(a)(4) and (g)(3), Plaintiff will fairly and adequately protect the interests of the Class members.

52. Plaintiff has retained attorneys experienced in the prosecution of class actions, including consumer and product defect class actions, and Plaintiff intend to prosecute this action vigorously. Neither Plaintiff nor class counsel have interests adverse to those of the Classes.

53. **Superiority**: Pursuant to Fed. R. Civ. P. 23(b)(3), this class action is superior to other available methods for the fair and efficient adjudication of this controversy. Plaintiff and the Class members have all suffered and will continue to suffer harm and damages because of Defendant's wrongful conduct. A class action is superior to other available methods for the fair and efficient adjudication of the controversy.

54. Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender. Class treatment will also permit the adjudication of claims by many members of the proposed class who could not individually afford to litigate a claim such as is asserted in this complaint. This class action likely presents no difficulties in management that would preclude maintenance as a class action.

## CLAIMS FOR RELIEF

## COUNT ONE
## FRAUD BY CONCEALMENT OR OMISSION

55.     Plaintiff realleges and incorporates by reference all paragraphs as though fully set forth herein.

56.     Ford was aware of the false and lower fuel economy ratings for the Class Vehicles when it marketed and sold the Class Vehicles to Plaintiff and Class members.

57.     Having been aware of the actual fuel economy of the Class Vehicles and having known that Plaintiff and Class members could not have reasonably been expected to know of the actual fuel economy efficiency, Ford had a duty to disclose this to Plaintiff and Class members in connection with the sale or lease of the Class Vehicles.

58.     Ford did not disclose the actual fuel economy efficiency.

59.     Ford intentionally concealed the above-described material information, or acted with reckless disregard for the truth, and denied Plaintiff and the Class information that is highly relevant to their purchasing or leasing decision.

60.     The Class Vehicles purchased or leased by Plaintiff and Class members had, in fact, lower fuel economy efficiency because of Ford's manipulation of certification testing.

61.     Ford further affirmatively misrepresented to Plaintiff and the Class in advertising and other forms of communication, including standard and uniform material provided with each vehicle, that the vehicles they were selling had a certain higher fuel economy efficiency.

17

62.     The concealment and/or omissions were material because they were facts that would typically be relied on by a person purchasing these types of vehicles. Plaintiff and Class members reasonably relied on Ford's material misrepresentations with respect to the Class Vehicles.

63.     The concealment and/or omissions were material because if it had been disclosed, Plaintiff and Class members would not have purchased or leased the Class Vehicles. At a minimum, Plaintiff and Class members would have paid less for the Class Vehicles.

64.     As a result of Ford's concealment and omissions, Plaintiff and Class members have been injured in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase and/or the diminished value of their vehicles.

## COUNT TWO
### UNJUST ENRICHMENT

65.     Plaintiff realleges and incorporates by reference all paragraphs as though fully set forth herein.

66.     Because of its wrongful acts and omissions, Defendant charged a higher price for the Class Vehicles than the Class Vehicles' true value and Defendant obtained money which rightfully belongs to Plaintiff and the members of the Class.

67.     Plaintiff and Class members conferred a benefit on Defendant by purchasing or leasing the Class Vehicles.

68.     Defendant had knowledge that this benefit was conferred upon it.

69.     Defendant has been unjustly enriched at the expense of Plaintiff and Class members, and its retention of this benefit under the circumstances would be inequitable.

70.     As a direct and proximate result of Defendant's unjust enrichment, Plaintiff and the Class have suffered and continue to suffer various damages, including, but not limited to, restitution of all amounts by which Defendant was enriched through its misconduct.

**COUNT THREE**
**VIOLATIONS OF MAGNUSON-MOSS WARRANTY ACT**
**(15 U.S.C. § 2301, *et seq.*)**

71.     Plaintiff incorporates by reference and realleges all paragraphs alleged herein.

72.     This Court has jurisdiction to decide claims brought under 15 U.S.C. § 2301 pursuant to 28 U.S.C. § 1332 (a)-(d).

73.     Plaintiff and Class members are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

74.     Ford is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

75.     The Class Vehicles are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

76.     15 U.S.C. § 2310(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written or implied warranty.

77.     As more fully described above, in selling the Class Vehicles, Ford expressly warranted in advertisements that the Class Vehicles experienced fuel-economy efficiency.

78.     These express warranties are written warranties within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(6). The Class Vehicles' implied warranties are covered under 15 U.S.C. § 2301(7). These warranties became part of the basis of the bargain.

79.     Defendant breached these warranties as described in more detail above including, but not limited to, selling Class Vehicles not covered by any valid EPA certificates of conformity, and/or experienced less MPG than represented by Ford to its customers, the public, and regulators.

80.     Any efforts to limit the implied warranties in a manner that would exclude coverage of the Class Vehicles is unconscionable, and any such effort to disclaim or otherwise limit liability for the Class Vehicles is null and void.

81.     Plaintiff and each Class member has had sufficient direct dealings with Ford or its agents (dealerships) to establish privity of contract.

82.     Nonetheless, privity is not required here, because Plaintiff and each of the other Class members are intended third-party beneficiaries of contracts between the Ford and its dealers, and specifically, of the implied warranties. The dealers were not intended to be the ultimate consumers of the Class Vehicles, and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for, and intended to benefit, consumers.

83.     Affording Ford a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile. At the time of sale or lease of each Class Vehicle, Ford knew or should have known of the misrepresentations concerning the Class Vehicles' fuel economy ratings, but nonetheless failed the rectify the misrepresentation. Under the circumstances, the remedies available under any informal settlement procedure would be inadequate, and any requirement that Plaintiff or Class members resort to an informal dispute resolution procedure or afford Ford a reasonable opportunity to cure breach is excused and thus deemed satisfied.

84.     The amount in controversy of Plaintiff's individual claims meets or exceeds the sum of $25. The amount in controversy of this action exceeds the sum of $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit.

85.     As a result of Defendant's breach of warranties, Plaintiff and Class members are entitled to revoke their acceptance of the Class Vehicles, and obtain all damages, equitable relief, and costs permitted by law.

## COUNT FOUR
## BREACH OF EXPRESS WARRANTY

86.     Plaintiff realleges and incorporates by reference all paragraphs as though fully set forth herein.

87.     Defendant is, and at all relevant times was, a merchant with respect to the Class Vehicles.

88.    Defendant, in connection with its business activities or through its authorized dealers and agents, warranted and represented expressly through its advertisements, including window stickers, that the vehicles provided a favorable fuel economy of the specific MPGs, depending on the vehicle.

89.    These warranties became part of the basis of the bargain.

90.    Ford breached these warranties because the Class Vehicles' fuel economy ratings were inaccurate; and by knowingly selling to Plaintiff and Class members vehicles with false or misleading fuel economy ratings which did not conform to the warranty.

91.    Ford had notice of all applicable issues with the inaccurate fuel economy ratings, as well as internal knowledge derived from testing and internal expert analysis.

92.    Plaintiff and Class members have been damaged as a direct and proximate result of the breaches by Ford.

93.    Plaintiff and Class members are entitled to damages, including the diminished value of their vehicles, and all other damages allowable under the law.

**COUNT FIVE**
**VIOLATIONS OF MINNESOTA PREVENTION OF CONSUMER FRAUD ACT**
**Minn. Stat. §§ 325F.68, *et seq.***

94.    Plaintiff realleges and incorporates by reference all paragraphs as though fully set forth herein.

95.    The Minnesota Consumer Prevention of Consumer Fraud Act ("Minnesota CFA") prohibits the "[t]he act, use, or employment by any person of any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive trade

practice, with the intent that others rely thereon in connection with the sale of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby." Minn. Stat. § 325F.69.

96.    Plaintiff and the Class are "persons" as that term is defined in Minn. Stat. § 325F.68.

97.    Ford's Class Vehicles constitute "merchandise within the meaning of Minn. Stat. § 325F.68 subd. 2.

98.    Defendant has engaged in fraud and deceptive trade practices by the conduct, statements, and omissions described above, and by knowingly and intentionally concealing from Plaintiff and the Class that the Class Vehicles cannot achieve the fuel economy, power, and durability promised when driving in real-world conditions, and diminished value of the Class Vehicles as a result of this. Defendant should have disclosed this information because it was in a superior position to know the true facts, and Plaintiff and Class members could not reasonably be expected to learn or discover the true facts.

99.    These acts and practices have deceived Plaintiff and are likely to deceive the public. In failing to disclose and suppressing other material facts from Plaintiff and the Class, Defendant breached its duties to disclose these facts, violated the Minnesota CFA, and caused injuries to Plaintiff and Class members. The omissions and acts of concealment by Defendant pertained to information that was material to Plaintiff and the Class, as it would have been to all reasonable consumers.

100.    Absent those misrepresentations and omissions, Plaintiff and the Class would not have purchased the Class Vehicles, would not have purchased the Class Vehicles at the prices they paid, and/or would have purchased less expensive vehicles that had accurate fuel economy ratings.

101.    The injuries suffered by Plaintiff and the Class members are greatly outweighed by any potential countervailing benefit to consumers or to competition, nor are they injuries that Plaintiff and the Class could have reasonably avoided.

102.    Plaintiff and Class members did not receive the benefit of their bargain as a result of Defendant's misconduct.

103.    Defendant's unlawful acts and practices complained of herein affect the public interest. As a direct and proximate result of Defendant's violations of the Minnesota CFA, Plaintiff and the Class have suffered injury-in-fact and/or actual damage.

104.    Pursuant to Minn. Stat. § 8.31 subd. 3a, Plaintiff and the Class seek actual damages, attorneys' fees, and any other just and proper relief available under the Minnesota CFA. This action will achieve a public benefit. The misrepresentations by Defendant was significant and directly contributed to the harm suffered by Plaintiff and the Class. The misrepresentations were made to increase profits at the expense of Plaintiff and Class members. Plaintiff seeks monetary and injunctive relief, in order to stop further harm to Plaintiff and Class members.

105.    In the alternative, pursuant to Minn. Stat. §§ 325F.69 subd. 1 and 325F.70 subd. 1, Plaintiff requests that this Court enjoin Defendant from engaging in misrepresentation and deceptive practices.

### COUNT SIX
### VIOLATIONS OF MINNESOTA UNIFORM
### DECEPTIVE TRADE PRACTICES ACT
### Minn. Stat. §§ 325D.43-48, *et seq.*

106.    Plaintiff realleges and incorporates by reference all paragraphs as though fully set forth herein.

107.    The Minnesota Deceptive Trade Practices Act, Minn. Stat. § 325D.44, ("Minnesota DTPA") prohibits, inter alia, deceptive trade practices, which occur when a person "(5) represents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have;" "(7) represents that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another;" and "(9) advertises goods or services with intent not to sell them as advertised."

108.    In the course of its business, Ford failed to disclose and actively concealed the Class Vehicles' true fuel efficiency and emissions or otherwise engaged in activities with a tendency or capacity to deceive consumers as to Class Vehicles' true fuel efficiency and emissions. Ford also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment,

suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

109.    Ford further compounded the deception by repeatedly asserting, in its marketing, that the Class Vehicles' fuel economy ratings made them some of the most fuel efficient gas-powered trucks.

110.    Ford's unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, were intended to mislead or had a tendency or capacity to mislead and create a false impression in consumers, and were likely to and did in fact deceive reasonable consumers, including Plaintiff and the Class, about the true power and fuel economy of the Class Vehicles.

111.    Ford knew or should have known that its conduct violated the Minnesota DTPA.

112.    Plaintiff and the Class suffered ascertainable loss and actual damages as a direct and proximate result of Ford's misrepresentations and its concealment of and failure to disclose material information related to Class Vehicles' fuel economy. Absent those misrepresentations and omissions, Plaintiff and the Class would not have purchased the Class Vehicles, would not have purchased the Class Vehicles at the prices they paid, and/or would have paid significantly less for it, which shows that Plaintiff and the Class actually relied on Defendant's misrepresentations and omissions.

113.    Plaintiff and Class members did not receive the benefit of their bargain as a result of Defendant's misconduct.

114.    Pursuant to Minn. Stat. § 8.31 subd. 3a, Plaintiff and the Class seek actual damages, attorneys' fees, and any other just and proper relief available under the Minnesota DTPA.

115.    This action will achieve a public benefit. The misrepresentations by Ford was significant and directly contributed to the harm suffered by Plaintiff. The misrepresentations were made to increase profits at the expense of Plaintiff and Class members.

## **RELIEF REQUESTED**

Plaintiff, individually and on behalf of Class members, respectfully requests that the Court enter judgment in his favor and against Ford as follows:

a.   Certification of the proposed classes, including designation of Plaintiff as the class representative and appointment of Plaintiff's counsel as Class Counsel;

b.   Judgment against Ford for Plaintiff and Class members' asserted causes of action;

c.   Judgment temporarily and permanently enjoining Ford from continuing the unlawful, deceptive, fraudulent, harmful and unfair business conduct and practices alleged in this Complaint;

d.   Judgment temporarily and permanently enjoining Ford from continuing to sell, market or distribute the Class Vehicles;

e.   All applicable statutory and civil penalties;

f.  An order requiring Ford to pay both pre- and post-judgment interest on any

amounts awarded;

g.  An award of costs and attorneys' fees, as allowed by law; and

h.  Such further relief as the Court deems just.

## JURY TRIAL DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: July 17, 2019                    Respectfully submitted,

*s/David A. Goodwin*
David A. Goodwin (#386715)
Daniel E. Gustafson (#202241)
Raina C. Borrelli (#392127)
Ling S. Wang (#399447)
**GUSTAFSON GLUEK PLLC**
120 South Sixth Street, Suite 2600
Minneapolis, MN 55402
Tel: (612) 333-8844
Fax: (612) 339-6622
Email: dgoodwin@gustafsongluek.com
        dgustafson@gustafsongluek.com
        rborrelli@gustafsongluek.com
        lwang@gustafsongluek.com

Simon B. Paris
Patrick Howard
Charles J. Kocher
**SALTZ, MONGELUZZI,**
**BARRETT & BENDESKY, P.C.**
1650 Market Street, 52nd Floor
Philadelphia, PA 19103
Telephone: (215) 496-8282
Fax: (215) 496-0999
E-mail:  sparis@smbb.com
          phoward@smbb.com
          ckocher@smbb.com

*Attorneys for Plaintiff and the Proposed Class*